Howard Davis v. Commissioner.
Davis v. Commissioner
Docket No. 21204.
United States Tax Court
T.C. Memo 1955-87; 1955 Tax Ct. Memo LEXIS 251; 14 T.C.M. (CCH) 294; T.C.M. (RIA) 55087; April 14, 1955
*251 1. Held, petitioner's income for each of the taxable years (with some adjustments) properly determined by using the net worth method. [1939 Code Sec. 293(b) - similar to 1954 Code Sec. 6653(b)] 2. Held, at least part of the deficiency in each of the taxable years was due to fraud with intent to evade tax. [1939 Code Sec. 291(a) - similar to 1954 Code Sec. 6651(a)] 3. Held, petitioner is liable for additions to tax under section 291 (a) of the 1939 Code for failure to file a timely return for 1943 and for failure to file a properly executed return for 1944. *252 Lucien L. Dunbar, Esq., and John E. Scott, Esq., for the petitioner. Elmer E. Lyon, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in the income tax of petitioner and additions to tax as follows: Section
Section
291(a) Addi-
293(b) Addi-
Year
Income Tax
tion to Tax
tion to Tax
1942
$ 5,938.25
$ 2,969.13
1943
31,971.47
$ 3,161.96
15,809.80
1944
43,316.54
10,829.14
21,658.27
1945
101,111.82
50,555.91
The issues for decision are: 1. Whether respondent correctly determined petitioner's net income for each of the taxable years using the net worth method. 2. Whether respondent correctly determined that at least part of the deficiency in each of the taxable years was due to fraud with intent to evade tax. 3. Whether respondent correctly determined that petitioner is liable for additions to tax under section 291(a) of the Internal Revenue Code of 1939 for failure to file a timely return for 1943 and a properly executed return for 1944. Findings of Fact The stipulated facts are so found. Petitioner resides in Anderson, Indiana, and *253 filed his income tax returns for the years involved with the collector of internal revenue for the district of Indiana. Petitioner's 1943 income tax return was filed on April 15, 1944. His purported income tax return for 1944, which was signed by the accountant who prepared it but not by petitioner, was filed on March 9, 1945. Petitioner kept his books and filed his income tax returns on a cash basis of accounting. Petitioner was born around 1903 and has always lived in Madison County, Indiana. He completed high school in the 1920's. His only other formal education consisted of some short agricultural courses at Purdue University. Petitioner's knowledge of bookkeeping was limited, but he was an intelligent and able business man. After completing high school, petitioner raised pickles on his father's farm. In 1929 he began raising field corn. When the price of field corn went very low in 1932, he decided to raise popcorn. The price of popcorn was high because of the cost of picking it. In 1933 petitioner developed the first mechanical picker which enabled him to harvest popcorn economically. He sold popcorn to customers in Madison and surrounding counties. Until 1935 petitioner *254 raised popcorn only on the family farm. In that year he began contracting with other farmers to plant his seed and to cultivate the popcorn. When the popcorn was mature, petitioner would harvest it with his mechanical pickers and would pay the farmer for the popcorn. Petitioner grew and contracted with others to grow a substantial number of acres of popcorn in 1939, 1940, and 1941. In 1941, 325 acres of the 350-acre farm, which was then owned by petitioner and his mother, were planted in popcorn. A good farmer could raise between 1,500 and 2,000 pounds of popcorn per acre in 1941, and petitioner raised nearly 600,000 pounds of popcorn on the family farm in that year. Petitioner acquired an especially large quantity of popcorn in 1941 expecting to use most of it in supplying the Overland Candy Company. As the latter did not carry out what petitioner thought were the terms of the agreement, petitioner kept the popcorn. The average price received by growers throughout the United States for ear popcorn in 1941 was $2.08 per 100 pounds. In 1940 the average price received was lower. At the end of 1941 petitioner had approximately 1,800,000 pounds of popcorn stored in cribs on the family *255 farm. This popcorn had been grown on the farm in 1941 or earlier years or had been acquired under petitioner's contracts with other famers. Petitioner also had some popcorn stored at his manufacturing plant and some stored on the farms of others. The popcorn which petitioner had at the beginning of 1942 cost approximately $31,352. Petitioner spent nearly all the cash he had or could borrow purchasing popcorn during 1941. He did not have in excess of $933 in cash at the end of that year. Petitioner was continuously borrowing sums up to $4,000 from the Pendleton Banking Company between January 1, 1935, and December 3, 1941. He did not file an income tax return prior to 1942 when he filed a nontaxable return for 1941. There is no record of petitioner's mother or father ever filing an income tax return. Petitioner's father died on February 14, 1934, leaving personal property appraised at $10,653.03. Popcorn matures in the fall and is gathered, shucked, and stored on the ear in cribs to dry. After a drying period of from six to nine months, it is shelled, cleaned, and placed in 100-pound bags by a processor. One hundred pounds of ear popcorn makes approximately seventy pounds of shelled *256 popcorn. Petitioner was a grower and processor of popcorn. His processing operations were conducted on the family farm. In 1939 petitioner acquired a plant in Anderson, Indiana, and began popping or manufacturing popcorn under the name Better Taste Popcor Company. In 1941 the plant employed approximately eight persons. During the taxable years involved petitioner used all of the popcorn he had or acquired in his manufacturing operations. In the latter part of 1942 and until December 1943, when an OPA price ceiling was imposed, raw processed popcorn was selling for as much as 16 to 17 cents a pound. The OPA ceiling price was 8.75 cents per pound on processed popcorn. Records of purchases of popcorn and all records in connection with the farm and the processing of popcorn were maintained personally by petitioner prior to and during the taxable years. These records, which consisted of a day book in which petitioner recorded amounts paid out and amounts received, were destroyed by fire in 1946 subsequent to the start of an investigation of petitioner's income tax returns. No attempt was made to physically segregate popcorn which was purchased and popcorn which was grown by petitioner. *257 Petitioner, in at least one of the taxable years involved, furnished his accountant, who prepared his income tax returns, with inventory and purchase figures based upon market price rather than cost. Petitioner did not keep accurate inventory and purchase records, and his books and records did not properly reflect his true income during the years 1942 to 1945, inclusive. From 1940 until the middle of 1944 records of petitioner's manufacturing operations were maintained by the plant manager, McGuire. Thereafter these records were maintained by Lillian Johnson in accordance with the instructions of petitioner's accountant. Petitioner filed financial statements with the Anderson Banking Company of Anderson. Indiana, showing a net worth on June 12, 1941, April 1, 1942, January 3, 1944, January 3, 1945, and November 10, 1945, in the respective amounts, as follows: $64,466.49, $74,093.00, $112,549.00, $126,602.78, and $430,634.92. Each statement contained a certification signed by petitioner certifying the document to be a true and correct statement of petitioner's financial condition on that date. In 1942, 1943, and 1944 petitioner drew checks on Pendleton Banking Company for the *258 purchase of popcorn and farm expenses and received unreported farm income as follows: Popcorn
Farm
Unreported
Year
Purchases
Expenses
Farm Income
1942
$11,937.29
$ 6,418.48
$10,509.83
1943
19,273.68
28,608.34
4,308.54
1944
18,620.73
10,068.33
2,556.16
On his 1942, 1943, 1944, and 1945 income tax returns petitioner reported purchases of $43,146.66, $168,296.33, $240,793.40, and $467,262.51, respectively. In 1944 petitioner transferred $40,000 to an Iowa bank to be used for the purchase of popcorn. Petitioner had at least $1,344.55 worth of residence furniture on January 1, 1942, and his liabilities on that date, exclusive of the amount borrowed from his mother, were notes payable in the amount of $10,200 and accounts payable in the amount of $800. Petitioner paid $13,448.66 for furniture during 1945. Petitioner's living expenses were $5,000, $7,000, $12,000, and $10,000 in 1942, 1943, 1944, and 1945, respectively. He paid income tax in the amount of $16,131.55 during those four years. His net worth increased $230,357.94 from January 1, 1942 to December 31, 1945. Petitioner's total income for the four years was $280,489.49. Respondent determined *259 petitioner's income for each of the taxable years involved by allocating the sum of petitioner's net worth increase and nondeductible expenditures over the four years on the basis of adjusted gross sales, as follows: 1942
Reported Sales
$ 68,232.01
Unreported Sales
10.509.85
$ 78,741.86
6.85%
1943
Reported Sales
$217,393.10
Unreported Sales
7,208.54
224,601.64
19.54%
1944
Reported Sales
$287,335.16
Unreported Sales
2,556.16
289,891.32
25.22%
1945
Reported Sales
$555,435.43
Unreported Sales
928.87
556,364.30
48.39%
Total Sales
$1,149,599.12
100%
[The percentages shown represent the ratio which adjusted gross sales for each of the years bears to the total adjusted gross sales for those years.] Petitioner's reported, actual, and unreported adjusted gross income for each of the taxable years was as follows: Year
Reported
Actual
Unreported
1942
$ 4,978.14
$ 19,213.53
$ 14,235.39
1943
8,604.22
54,807.65
46,203.43
1944
17,679.56
70,739.45
53,059.89
1945
26,594.96
135,728.86
109,133.90
At least part of the resulting deficiency in each of the above years was due to fraud with *260 intent to evade tax. Opinion The principal issue in dispute is whether the Commissioner properly resorted to the sum of petitioner's net worth increase and nondeductible expenditures to determine petitioner's net income for the taxable years involved. Petitioner's contends that the books and records used in preparing his income tax returns clearly reflect his net income and that under the circumstances the Commissioner is precluded by section 41 of the Internal Revenue Code of 1939 from using another method of accounting in computing his net income. But the net worth method is not a method of accounting. It may be used, however, as a guide for determining the amount of income actually received where the net worth computation reveals a substantial gap between reported income and the increase in net worth plus nondeductible expenditures or where the books are otherwise shown to have been inaccurately maintained. Estate of George L. Cury, 23 T.C. 305 (November 23, 1954). The parties have stipulated the amount of petitioner's nondeductible expenditures and petitioner has conceded the correctness of respondent's determination of his December 31, 1945 net worth. Respondent *261 has relied upon financial statements filed by petitioner with the Anderson Banking Company to establish petitioner's beginning net worth. Petitioner argues that these statements were not prepared from his books and that they grossly understate his assets. But even if we were inclined to accept petitioner's unsupported testimony with regard to the amount of his assets on January 1, 1942, there would still be a substantial gap between petitioner's reported net income and the sum of his net worth increase and expenditures. Furthermore, the parties have stipulated that there was unreported income from the farm owned by petitioner and his mother in the years 1942, 1943, and 1944 in the amounts of $10,509.83, $4,308.54, and $2,556.16, respectively. This contradicts petitioner's contention that his farm records, which were destroyed by fire, were accurately maintained. Also, the record indicates and we have found as a fact that petitioner did not keep an accurate record of inventory and purchases which were of crucial importance in determining his net income. Cf. Estate of George L. Cury, supra.Under the circumstances respondent was clearly justified in using the net worth *262 method. The only controversy with regard to respondent's computation of petitioner's net income using the net worth method, aside from the validity of resorting to that method in the first place, concerns the amount of the beginning net worth. We disagree with respondent's contention that the petition does not place this matter in issue. Our findings with respect to the beginning net worth are based not only upon observation of the witnesses as they testified, but upon careful study of the entire voluminous record. Without attempting a complete analysis of our findings, we shall comment briefly on the items in controversy. Inventory. On his income tax return for the year 1942 petitioner reported a beginning inventory of $9,221.46. This amount was used by respondent in computing petitioner's beginning net worth. We agree with petitioner's contention that the cost of his inventory substantially exceeded that amount. We have found as a fact that petitioner had approximately 1,800,000 pounds of popcorn stored on his farm at the end of 1941. Petitioner undoubtedly had some popcorn stored at his manufacturing plant, and he had some popcorn stored upon the land of farmers from whom *263 he had purchased it. Of the total amount, around 600,000 pounds had been grown in 1941 on the farm of petitioner and his mother, an undisclosed amount had been grown on that farm in prior years, and the rest had been purchased for the most part during 1941. The average price received by growers for ear popcorn in 1941 was $2.08 per hundred pounds. They had received less in 1940. On a financial statement rendered as of April 1942, petitioner estimated the cost of his "salable merchandise" at $31,352. Since popcorn was purchased in the fall, there would be little difference between petitioner's inventory in April and at the first of that year. As this figure can be reconciled with the known facts set forth above, we have accepted it as petitioner's beginning inventory. We have rejected petitioner's wholly unsupported testimony that the above amount is "considerably lower" than his actual inventory on that date. Not only have we found petitioner's testimony generally unreliable, but the existence of an inventory in excess of the amount found is refuted by the evidence. Cash. Respondent determined that at the beginning of 1942 petitioner had $933 in cash which was the amount shown *264 on the financial statement rendered by petitioner on June 12, 1941. Certainly any contention that he had additional cash is refuted by petitioner's testimony that he used all the money he had purchasing popcorn during the later part of 1941. On an April 1942 financial statement petitioner reported that he had $1,500 in cash. By April petitioner should have had substantially more cash than at the first of the year. Petitioner testified that he had $150,000 in cash when he rendered the financial statement of June 12, 1941. We find this testimony wholly unbelievable. Prior to mentioning this cash hoard, which had allegedly been hidden in the well pit of the milkhouse since 1936, petitioner testified several times that he was unable to name any assets which had been omitted from the statement of June 12, 1941. It is unlikely that petitioner would have forgotten $150,000 in cash if it had really existed. Petitioner did not attempt to explain the source of the cash. Furthermore, the existence of a large amount of cash is inconsistent with petitioner's continuous borrowings from the Pendleton Banking Company between January 1, 1935 and December 3, 1941, and with petitioner's failure to *265 file an income tax return prior to 1942 when he filed a non-taxable return for 1941. In addition, petitioner testified that he spent all the cash he had and all he could borrow purchasing popcorn in 1941. With $150,000 in cash petitioner could have procured several times the amount of popcorn the record shows he actually acquired. Furniture. Respondent made no allowance for residence furniture in computing petitioner's beginning net worth. Even though this determination was erroneous, no distortion of the net worth increase would result if respondent included only furniture purchased during the taxable years in the ending net worth. Respondent has shown that petitioner paid $13,448.66 for furniture during those years. The remaining $1,344.55 in furniture included in the ending net worth, which was obviously the result of respondent's inclusion therein of returned merchandise, was not shown to have been purchased during the taxable years. As we have accepted petitioner's testimony that he had at least $1,344.55 in furniture prior to 1942, we have included that amount in his beginning net worth. Liabilities. Respondent used petitioner's financial statement of June 12, 1941, in determining *266 petitioner's liabilities at the beginning of 1942. Subsequent to rendering the above statement, petitioner borrowed substantial amounts to purchase popcorn. We have, therefore, based our findings upon petitioner's financial statement of April 1942, which more accurately sets forth the amount of his liabilities at the beginning of that year. Not included on the financial statement of April 1942 was an unknown amount which petitioner owed his mother, but for the purpose of determining petitioner's net worth increase this liability may be offset by the unknown amount he owed his mother at the end of 1945. Fraud. We have found that a part of the deficiency for each of the taxable years 1942 to 1945, inclusive, is due to fraud with intent to evade tax. In our opinion this finding is supported by clear and convincing evidence. The record discloses that petitioner's true taxable income was nearly five times the amount reported over the four taxable years involved. Despite his limited knowledge of bookkeeping, from the amount of his cash expenditures for personal items alone, petitioner could not help but have known that his income far exceeded the amount reported. Petitioner was not *267 stupid, but was an intelligent and able business man. He knew that his net worth was increasing substantially during the taxable years involved; and his story about having $150,000 hidden in the milkhouse, in order to explain his newly acquired wealth, was patently false. This and other facts of record demonstrate petitioner's willingness to disregard the truth in order to avoid tax liability. We are also unimpressed with petitioner's attempt to shed responsibility for any understatement of income by contending that he relied upon others to maintain his books and to prepare his tax returns. A very substantial portion of petitioner's net income undoubtedly resulted from his acquisition of a very large quantity of ear popcorn in 1941 immediately prior to an extremely sharp rise in prices. All of this popcorn was used in petitioner's manufacturing operations and was reflected in either the inventory or purchase figures on his tax returns. As these figures were furnished by petitioner, he was solely responsible for their accuracy; and it is highly unlikely that ignorance or innocent error could cause a distortion of these figures to the extent necessary to account for the unreported income. *268 These and other facts of record establish by clear and convincing evidence that at least part of the deficiency in each of the taxable years was due to fraud with intent to evade tax. Therefore, respondent properly determined 50 per cent additions to tax under section 293(b) of the 1939 Code. [1]
Failure to file. Respondent determined a 10 per cent addition to tax for 1943 because of petitioner's failure to file an income tax return for that year until April 15, 1944. He determined a 25 per cent addition to tax for 1944 for failure to file a properly executed return. The purported return filed was signed by the accountant who prepared it, but not by the petitioner. Failure to file a properly executed return is equivalent to a failure to file a return. Theodore R. Plunkett, 41 B.T.A. 700, affd. (C. *269 A. 1), 118 Fed. (2d) 644. The additions to tax imposed were mandatory under section 291(a) of the 1939 Code, [2] unless the failures to file were "due to reasonable cause and not due to willful neglect." Since there is no evidence to support such a finding, respondent's determination is sustained. *270 Decision will be entered under Rule 50. Footnotes
1. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2).↩
2. SEC. 291. FAILURE TO FILE RETURN. (a) In case of any failure to make and file return required by this chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. The amount so added to any tax shall be collected at the same time and in the same manner and as a part of the tax unless the tax has been paid before the discovery of the neglect, in which case the amount so added shall be collected in the same manner as the tax. The amount added to the tax under this section shall be in lieu of the 25 per centum addition to the tax provided in section 3612(d)(1).↩